(909 P.2d 662)

No. 73,252

In the Matter of the Estate of J.W. Hessenflow, Deceased. LORENE HESSENFLOW, *Appellee*, v. CHARLES HESSENFLOW, *Appellant*.

Opinion filed December 15, 1995.

*Timothy J. Knopp*, of Timothy J. Knopp & Associates, P.A., of Overland Park, and *Steven W. Hirsch*, of Hirsch & Pratt, L.L.P., of Oberlin, for appellant.

*Barbara W. Foster*, of Leawood, and *Thomas DeCoursey*, of Kansas City, for appellee.

Before LEWIS, P.J., RULON, J., and MARION W. CHIPMAN, District Judge Retired, assigned.

RULON, J.: Charles Hessenflow, executor, appeals various orders of the district court. We affirm.

The facts of this case are essentially undisputed and are as follows:

J.W. Hessenflow died testate on April 24, 1992, survived by three adult children and his second wife, Lorene Hessenflow. The decedent's will with attached Consent of Petitioner was admitted to probate on June 9, 1992, at the request of his son, Charles Hessenflow. Charles Hessenflow was named as the executor in his father's will. Charles and Lorene signed an estate agreement on July 5, 1992, which was approved by the court on August 20, 1992. The agreement set aside certain assets to Lorene in return for her complete release of all claims against the estate. In January 1993, Lorene filed petitions to set aside the estate agreement and to award her a homestead and spousal allowance. Lorene further filed an election to take by intestate succession and a petition to remove Charles as executor of the estate. Charles filed a motion to dismiss which was denied. The matter was tried to the court. The court held that Lorene's consent to the will was invalid, the estate agreement should be set aside, Lorene could elect to take by intestate succession, Lorene would be awarded $25,000 as a spousal allowance, and Charles would be removed and another executor appointed. Lorene's request for a homestead allowance was denied. Charles appealed.

## THE ELECTION

The first issue we consider is whether the district court erred when finding Lorene's election to take by intestate succession was timely.

K.S.A. 59-2233 (Ensley) reads:

"Except where the court has previously determined the validity and binding consent to a will, when a will is admitted to probate the court shall forthwith transmit to the surviving spouse a certified copy thereof, together with a copy of K.S.A. 59-603 and this section and certify to such transmittal. If such spouse has consented to the will, as provided by law, such consent shall control; otherwise such spouse shall be deemed to have elected to take under the testator's will unless such spouse shall have filed in the district court, within six months after the probate of the will, an instrument in writing to take by the law of intestate succession. If such spouse files an election before the inventory and valuation of the estate is filed, the election shall be set aside upon petition of the spouse made within 30 days after the filing of the inventory and valuation. For good cause shown, the court may permit an election within such further time as the court may determine, if a petition therefor is made within the period of six months."

Clearly, Lorene did not file her election to take by intestate succession within 6 months of the will being admitted to probate. This record shows the will was admitted for probate on June 9, 1993. Therefore, the 6 months lapsed on December 9, 1993. But, the trial court found that Lorene's failure to make the election within the necessary 6 months was excusable because she did not know the extent of J.W.'s estate. According to the court, the reason Lorene did not know the extent of the estate was because the executor, Charles, withheld information which he had a fiduciary duty to disclose.

Citing *In re Estate of Jones*, 179 Kan. 744, 298 P.2d 230 (1956), Charles argues the court erred in allowing Lorene to elect against the will because the 6-month period has been held to be absolute. Therefore, because Lorene did not file her petition within 6 months of the probate of the will, Charles argues she is barred from making such election.

In *Jones*, our Supreme Court construed G.S. 1949, 59-2233 and G.S. 1949, 59-603. G.S. 1949, 59-2233 read:

"When a will is admitted to probate the court shall forthwith transmit to the surviving spouse a certified copy thereof. If such spouse has not consented to the

will, as provided by law, such spouse shall be deemed to have renounced and refused to elect to take under the will unless he shall have filed in the probate court an instrument in writing to accept the provisions of such will within six months after probate of the will. If the said spouse files an election before the appraisement of the estate is filed, the said election shall be set aside upon application of the spouse made within thirty days after the filing of the appraisement. For good cause shown, the court may permit an election within such further time as the court may determine, if an application therefor is made within said period of six months."

In *Jones*, the widow had not filed an election to take under the will in the 6 months following the date of probate of the will. Her election was apparently filed 11 months after the will was probated. The widow in *Jones*, as does Lorene, argued that the statutes relating to the filing of an election were enacted for the benefit of widows and that strict compliance was not necessary. 179 Kan. at 747.

Furthermore, in *Jones*, the widow argued that she was not required to file an election until the filing of the inventory. The widow argued she had 30 days to file an election. 179 Kan. at 747. Our Supreme Court disagreed, saying:

"[T]he language of the statute (59-2233) pertaining to the inventory and appraisement does not in any manner extend the time in which an election must be filed. It simply relates to a situation where, if an election is filed within the six-month period, as the statute plainly requires, and the appraisement is filed at a later date, then a spouse has a right to have the election set aside if application to do so is made within thirty days after the appraisement is filed. The purpose of such provision is obvious, that is, after the appraisement is filed, a surviving spouse is given the opportunity to be relieved of an election therefore made, but the statute still requires that the election be made within six months from the date of the probate of the will, irrespective of when the inventory and appraisement is filed." 179 Kan. at 748.

The *Jones* court further noted that no application was made during the 6-month period for an extension of time in which to file an election. 179 Kan. at 748.

Here, Lorene argued to the district court, and the court so found, that there is an exception to the above-stated rule when a fraud has been perpetrated upon the surviving spouse.

Lorene cites *Younger v. Estate of Younger*, 198 Kan. 547, 426 P.2d 67 (1967), as authority for her contention that Kansas rec-

ognizes that equitable estoppel may be invoked to prevent the running of a statute of limitations in probate cases. *Younger* dealt with a situation where a wife had loaned her husband some money and had taken a note and a mortgage on certain property he owned. In her will she directed that if she died before the note was paid, her husband was not to be forced to pay the note or sell the property, but was to be given extensions of time for payment as he might request or as might be advisable. If he sold the property or paid off the note, the proceeds were to become part of her estate. The husband consented to the will. The wife subsequently died, and her will was admitted to probate. The husband did not contest the will. Twenty months after the wife's death, the husband died. The wife's estate was closed 1 month after the husband's death and her property, including the mortgage, was assigned to her children. The children then filed suit against the estate of the husband, seeking to foreclose on the mortgage. The problem arose because the note had come due more than 5 years earlier, and the husband's estate argued the statute of limitations barred the children's action. 198 Kan. at 549-50.

The *Younger* court concluded that the husband's consent to the wife's will operated as an extension of the note and mortgage. His giving up the right to elect to take half of her estate was consideration for the extension. By the provisions of the will, neither the wife's executor nor the children could foreclose on the mortgage, as the husband could invoke the provision directing that extensions be granted. Thus, the court concluded the agreement constituted an irrevocable contract between the parties, and because the due date of the note was extended, the husband's estate could not invoke the statute of limitations as a defense. 198 Kan. at 553-54.

The *Younger* court then went "one step further" and concluded that the husband's estate was estopped as a result of *resjudicata* from asserting the statute of limitations because he accepted the benefits of his wife's will and did not contest the validity of the consent language during the probate. 198 Kan. at 554-55. The court said: "One who accepts such benefits under a will is estopped to contest or attack its validity." 198 Kan. at 555. The court also recognized that equitable estoppel has been used in this state to

prevent the invocation of a statute of limitations. However, "[t]he law of estoppel operates only on parties to the transaction out of which it arises and on their privities." 198 Kan. at 555.

We believe the language in *Younger* concerning estoppel was dicta and thus is not binding. See *Medford v. Board of Trustees of Park College*, 162 Kan. 169, Syl. ¶ 1, 175 P.2d 95 (1946). The parties cite no Kansas case and our research fails to find any Kansas case which holds that the 6-month period for a spousal election against a will may be extended because the executor failed to disclose the complete value of the estate to the spouse. Other authorities do sometimes recognize such an exception.

"Failure to make an election within the statutory period may be excused where the beneficiary was induced to refrain from an election through the fraud or misrepresentation of interested parties, and accordingly an equitable extension may be granted." 80 Am. Jur. 2d, Wills § 1621, p. 677.

Lorene cites cases from other jurisdictions which recognize the rule.

In an arguably analogous situation, a surviving spouse who makes an election may have that election set aside upon a showing that the election was made because of fraud or mistake. 3 Bartlett's Kansas Probate Law and Practice § 1282 (rev. ed. 1939); see *In re Estate of Garden*, 158 Kan. 554, 148 P.2d 745 (1944); *In re Osborn's Estate*, 99 Kan. 227, 161 Pac. 601 (1916). Sound logic suggests that if a spouse who makes an election induced by fraud may revoke such election, so, too, a spouse who refrains from making an election because of fraud is not barred from making an untimely election.

Under facts shown here, the executor is estopped from claiming a spouse filed an untimely election against the will when the spouse failed to file a timely election due to fraud.

## THE CONSENT

Next, Charles contends the district court erred in finding the consent to the will and estate agreement were invalid. Charles asserts multiple reasons for seeking reversal of the court's finding that the consents were invalid.

## A. Statutory formalities

First, we must decide if the consent to the will was invalid because such consent did not comply with statutory formalities.

K.S.A. 59-602 (Ensley) reads in relevant part:

"Neither spouse shall will away from the other more than half of his or her property, subject to such rights and allowances, unless the other shall consent thereto in writing executed in the presence of two or more competent witnesses, or shall elect to take under the testator's will as provided by law."

Charles contends that he, as executor, submitted Lorene's consent to the will to the probate division of the district court (probate court) in August 1992. He also states that the probate court found the consent valid without objection by the parties. He complains that the district court erred in finding the consent invalid.

The first problem is that the record suggests the consent to the will was never presented to the probate court to determine its validity. On August 10, 1992, Charles filed a motion asking the probate court to approve the estate agreement. One of the provisions of the estate agreement stated that Lorene signed the consent with full knowledge of the nature and extent of J.W.'s property. On August 20, 1992, the probate court issued an order which reads in relevant part:

"Now on this 20th day of August, 1992 this matter comes on for hearing on the motion of the executor for approval of the document entitled 'Estate Agreement.' The executor appears by and through his attorney, Steven W. Hirsch, . . . There are no other appearances.

"The court notes that all interested parties have been notified of this hearing and no appearances by any of the parties have been made.

"The court, being first duly advised in the premises, finds that due to the lack of witnesses to the spousal consent of the will of J.W. Hessenflow, it is in the best interests of the estate that the 'Estate Agreement' be approved by the court. The court believes that the settlement is a fair and just settlement by the parties and approves the same."

When the will was submitted for probate, the court was not asked to rule, and never ruled, on the validity of the consent to the will. The district court, however, later ruled the consent was invalid because Lorene did not know the full value of all of the assets,

including the value of the farm corporation, the land, the equipment, and the cash and CDs.

As we understand, the probate court, when ruling on the validity of the estate agreement, found the consent did not contain the statutory formalities and was therefore not valid. The court erred in this conclusion. By the express verbiage of the statute, the consent must be in writing and be executed in the presence of two competent witnesses. K.S.A. 59-602(2) (Ensley).

This record shows that the consent was on page 2 of the will and was signed by Lorene. The following page contains the signatures of the two witnesses to the will. Unlike a will, there is no statutory requirement that the consent be subscribed by two competent witnesses who saw or heard the signer or maker acknowledge the same. See K.S.A. 59-606 (Ensley). Further, Lorene also testified that she signed the consent in the presence of the two witnesses. Therefore, the probate court was wrong in finding that the formalities of execution invalidated the consent to the will.

### B. Spousal knowledge

Next, we consider if the district court erred when finding Lorene's consent invalid because Lorene did not know the full extent of decedent's finances.

Kansas law provides that in order for a spouse's consent to a will to be valid, the spouse consenting to the other spouse's will must give his or her consent freely and understandingly. *Williams v. Sechler*, 127 Kan. 314, 317, 273 Pac. 447 (1929).

"After her husband's death a widow may raise an issue of nonconsent to his will, notwithstanding she has executed in statutory form a declaration of consent to the will, and she may sustain the issue by parol evidence, including evidence relating to the information she prossessed and her own state of mind when the declaration was executed." *Menke v. Duwe, et al.*, 117 Kan. 207, Syl. ¶ 1, 230 Pac. 1065 (1924).

Charles argues that it is not necessary for the spouse to know the value of the other spouse's property, only that he or she have a reasonably fair understanding of the other spouse's property. For example:

"Where a wife has a general understanding of her husband's property at the time she freely consents to take under his will and knows her rights under the law she may not later repudiate it because she subsequently discovers his estate is larger than she anticipated." *In re Estate of Patzner*, 173 Kan. 133, Syl. ¶ 5, 244 P.2d 1183 (1952).

Charles argues that Lorene had a general and fair understanding of J.W.'s property at the time the consent was signed and, therefore, Lorene should be bound by that consent. Conversely, Lorene argues she had little or no knowledge of her husband's property.

In *In re Estate of Ellis*, 168 Kan. 11, 28, 210 P.2d 417 (1949), our Supreme Court reviewed a number of prior decisions and said:

"The rule reduced from all these decisions is that the consent must be given freely and understandingly. It follows as a matter of course that whether that consent was freely and understandingly given is to be determined as of the time the document evidencing consent was executed."

The *Ellis* court concluded that the widow was fully aware of her husband's estate, was aware of the provisions of his will, knew for some time of the dispositions, made no effort to inform herself of her rights, made no protest to the testamentary documents, and executed the consent. The *Ellis* court held that the wife had signed the consent intelligently or that she was willing to act unintelligently and, thus, the consent was valid and binding. 168 Kan. at 29.

In the instant case, J.W. had an attorney draw up his will in which he left all of the funds deposited with Waddell and Reed to his wife Lorene, and the rest and residue of his estate to his three children. Lorene testified that J.W. gave her little or no notice that he was preparing his will but one day came home and asked her to go to town with him to sign something. She refused to go on such short notice, but a day or two later accompanied him to the lawyer's office and signed the consent. According to Lorene, she did not discuss the contents of J.W.'s will prior to signing the consent. Lorene testified she skimmed over the document, signed it, and left. Lorene further testified she and J.W. never discussed his financial condition. According to Lorene, she just took it for granted he would take care of her because he had always been

good to her. Lorene does admit that she and J.W. had discussed that Charles should be named as executor.

The attorney who drafted the will and consent testified that it was her practice to explain the consent to the person requesting the will. According to the attorney, she first met Lorene when she came in with J.W. to execute the will. The attorney testified that she went over the will and the consent with J.W. and Lorene, but did not remember reading it to them. The attorney further testified that while she did not remember what was said, it was her practice to inform the spouse consenting to the will of the significance of the consent and of the spouse's rights. The attorney further testified she specifically stopped Lorene from signing the consent because she wanted to explain to her the significance of her consent. The attorney did not remember, other than a discussion of the Waddell and Reed account, any discussion of J.W.'s property.

On cross-examination, the attorney testified that she did not discuss with J.W. or Lorene the homestead or the spousal allowance. The attorney presumed that J.W. would have been able to do that. She did not know if J.W. had discussed his worth with Lorene.

Charles is arguably correct when he states that it was not necessary for Lorene to know the full value of J.W.'s property and holdings at the time she signed the consent, but case law is clear that the consenting spouse must have a general knowledge of the size and value of the other spouse's property in order to freely and understandingly give his or her consent.

Whether Lorene had sufficient knowledge of J.W.'s property at the time of the consent is a question of fact. Our Supreme Court said:

"Where the trial court has made findings of fact and conclusions of law, the function of an appellate court is to determine whether the findings are supported by substantial competent evidence and whether the findings are sufficient to support the trial court's conclusions of law. Substantial evidence is evidence which possesses both relevance and substance and which furnishes a substantial basis of fact from which the issues can reasonably be resolved. Stated in another way, 'substantial evidence' is such legal and relevant evidence as a reasonable person might accept as being sufficient to support a conclusion. [Citation omitted.]

"In reviewing the decision of a trial court, this court must accept as true the evidence and all inferences to be drawn therefrom to support the findings of the

trial court, and must disregard any conflicting evidence or other inferences that might be drawn therefrom." *Tucker v. Hugoton Energy Corp.*, 253 Kan. 373, 377-78, 855 P.2d 929 (1993).

"The appellate courts are not to reweigh the testimony or pass on the credibility of witnesses." *McKissick v. Frye*, 255 Kan. 566, Syl. ¶ 8, 876 P.2d 1371 (1994).

Although it is not clear exactly what Lorene knew at the time she signed the consent, there is evidence that would support the district court's finding, albeit for a slightly different reason than stated. While it was not necessary that Lorene know the exact value or properties J.W. owned at the time she consented to the will, there is evidence she had little or no knowledge of his holdings. Consequently, we conclude the district court did not err in finding the consent was not binding. A trial court's decision which reaches the right result will be upheld, even though it may have relied upon the wrong ground or assigned erroneous reasons for its decision. *In re Estate of Murdock*, 20 Kan. App. 2d 170, 175, 884 P.2d 749 (1994).

## C. Jurisdiction

Lorene argues that this court, for reasons she does not make clear, does not have jurisdiction to consider the district court's finding concerning the validity of her consent to the will. Briefly said, we disagree with her claim.

## THE ESTATE AGREEMENT

Next, we must decide if the district court erred when finding the Estate Agreement invalid because of fraud. This issues has multiple prongs.

## A. Jurisdiction

Charles contends this court did not have jurisdiction to consider Lorene's challenge to the estate agreement because she failed to timely appeal the probate court's approval of the agreement.

Because this issue primarily involves the interpretation of statutes, this court's scope of review is unlimited. See *In re Estate of Watson*, 21 Kan. App. 2d 133, 135, 896 P.2d 401 (1955). Additionally, "Kansas appellate courts have jurisdiction to entertain an ap-

peal only if the appeal is taken within the time limitations and in the manner prescribed by applicable statutes." *Tobin Constr. Co. v. Kemp*, 239 Kan. 430, 437, 721 P.2d 278 (1986).

K.S.A. 59-2401 reads in relevant part:

"(a) An appeal may be taken within 30 days from the date of entry of any of the following orders . . .

. . . .

(22) An order finding or refusing to find that there is a valid settlement agreement."

This record shows that the estate agreement was approved by the court in an order filed August 21, 1992. Under K.S.A. 59-2401, Lorene had 30 days, or until September 21, to file a notice of appeal. No appeal was ever filed, but on January 22, 1993, Lorene filed a motion to set aside the estate agreement.

From the uncontroverted facts, Lorene filed her challenge to the estate agreement out of time. However, this does not end our discussion.

Lorene argues that the district court may set aside the estate agreement and its previous order by way of K.S.A. 59-2213, which reads in relevant part:

"The court shall have control of its orders, judgments, and decrees for thirty days after the date of the rendition thereof. Thereafter such orders, judgments, and decrees may be vacated or modified as provided in K.S.A. 60-260(b) of the code of civil procedure."

Lorene contends the district court, in essence, granted her motion pursuant to K.S.A. 60-260(b)(3) due to fraud, or K.S.A. 60-260(b)(1) due to excusable neglect, or K.S.A. 60-260(b)(6), "any other reason justifying relief." Charles argues that because Lorene did not style her petition as a motion under K.S.A. 60-260, she is now barred from doing so.

The statutes are clear that K.S.A. 60-260 is available for setting aside what would otherwise be final judgments. In *In re Estate of Newland*, 240 Kan. 249, 253, 730 P.2d 351 (1986), our Supreme Court concluded that a party had properly invoked K.S.A. 60-260 to reopen an estate. Therefore, even though the district court did not characterize its findings as such, the court properly allowed

Lorene's challenge under K.S.A. 60-260(b)(3). Once again, if the trial court is correct for any reason, its decision will be upheld.

## VALIDITY OF ESTATE AGREEMENT

Next, we must decide if the district court erred in finding the estate agreement invalid.

K.S.A. 59-102(8) defines a valid settlement agreement as "a written and acknowledged instrument which affects the administration or distribution of the estate and which is entered into by all heirs, devisees and legatees, and all other interested or affected persons, all of whom must be competent or authorized to enter into such agreement."

Family settlement agreements are favorites of the law, and beneficiaries under a will have a right to agree among themselves upon a distribution of the estate contrary to a disposition made under the will, or to abrogate the will, if such a agreement containing the mutual promises of the contracting parties is based upon a sufficient consideration. *In re Estate of Harper*, 202 Kan. 150, 159-60, 446 P.2d 738 (1968). Other than by way of a will or the laws of intestate succession, a family settlement agreement is the exclusive means of distributing a decedent's estate. *In re Estate of Leathers*, 19 Kan. App. 2d 803, 804, 876 P.2d 619 (1994).

The district court found that the estate agreement was not valid because Charles did not disclose to Lorene the full value of J.W.'s estate. According to the court, Charles used the consent (which Charles believed invalid) as a lever to induce Lorene to sign the agreement. As we understand, the court found that Charles induced Lorene to sign the agreement by telling her that because of the consent to the will, she would get nothing under the will and the estate agreement was a better deal. Because such claims were not accurate as far as Charles knew, the information which Lorene used to decide to enter into the agreement was not accurate and, therefore, her consent to the agreement was not given with an understanding of what she was giving up. The court found that an estate agreement (or family settlement agreement), like a consent to a will, must be entered into freely and with an understanding of

the value of·the estate and with an understanding of what the parties are giving up by not taking under the will.

In Kansas, it is clear that

"the law favors compromise and settlement of disputes and generally, in the absence of bad faith or fraud, when parties enter into an agreement settling and adjusting a dispute, neither party is permitted to repudiate it. [Citation omitted.]" *In re Estate of Thompson,* 226 Kan. 437, 440, 601 P.2d 1105 (1979).

" 'Where a family agreement or compromise is entered into in ignorance by one party of material facts which it is the duty of the other side to disclose, it will be set aside at the instance of the party who entered into it in ignorance of the facts.' [Citation omitted.]" *Ady v. Ady,* 110 Kan. 99, 102, 202 Pac. 597 (1921).

We are specifically asked to decide if the district court erred in finding the estate agreement was procured by fraud or misrepresentation.

Our research shows:

"The existence of fraud is normally a question of fact. Therefore, upon appeal, our standard of review is limited to determining whether the district court's findings of fact are supported by substantial competent evidence and whether the findings are sufficient to support the district court's conclusions of law.

"Fraud is never presumed and must be shown by clear and convincing evidence." *Waxse v. Reserve Life Ins. Co.,* 248 Kan. 582, Syl. ¶¶ 1, 3, 809 P.2d 533 (1991).

"An appellate court's review is limited to determining whether the trial court's finding is supported by competent evidence when that evidence is weighed in a manner most favorable to supporting the trial court's determination. [The appellate court] is not concerned with the credibility of witnesses or the weight of their testimony, and the trier of fact, not the court of appellate review, has the responsibility of determining what testimony should be believed." *Nordstrom v. Miller,* 227 Kan. 59, Syl. ¶ 9, 605 P.2d 545 (1980).

Fraud has been defined as:

"Actual fraud is an intentional fraud, and the intent to deceive is an essential element of the action. Constructive fraud, however, is a breach of a legal or equitable duty which, irrespective of moral guilt, the law declares fraudulent because of its tendency to deceive others or violate a confidence, and neither actual dishonesty of purpose or intent to deceive is necessary . . . . There must be a concealment of facts which the party is under a legal or equitable duty to communicate and in respect of which he could not be innocently silent. [Citation omitted.]" *Moore v. State Bank of Burden,* 240 Kan. 382, 389, 729 P.2d 1205 (1986), *cert. denied* 482 U.S. 906 (1987).

Also,

"[O]ne may be held liable for a false representation when the facts are peculiarly within his own knowledge, where it lies within his special province to know them, or where the other party has a right to suppose that he has used reasonable diligence to inform himself of the truth. The rule applies even though the party making the statements does not know that they are false, but actually believes them to be true, and has no intention to deceive or defraud the other party." 37 Am. Jur. 2d, Fraud and Deceit § 201, pp. 267-68.

This record shows that when Charles suspected the consent to the will was invalid, he contacted the attorney handling the estate and they decided to draft the estate agreement. Charles told Lorene the estate needed to be settled quickly because one of his siblings was filing for bankruptcy. The agreement provides that Lorene, at the time she signed the consent to the will, understood she would take nothing under J.W.'s will. The will actually stated she would receive the Waddell and Reed accounts. The agreement also stated the other beneficiaries under the will wished to set aside certain funds for Lorene. The agreement listed the following items that were to be Lorene's:

Security Mutual Life policy—$25,000;

United Commercial Travelers policy—$10,000;

A checking account with The Bank—$2,134.29;

Part of a CD in The Bank—$15,000;

Part ownership of a $5,000 scholarship fund in the memory of J.W.

In exchange, Lorene agreed not to elect against J.W.'s will. She subsequently agreed to take $10,000 in cash in lieu of the United policy.

As we understand the agreement, some of the "funds" set over to Lorene actually already belonged to her. The record shows the Security Mutual policy and the United policy both named Lorene as beneficiary. Charles testified he knew this at the time he entered into the estate agreement. Furthermore, one of the CD's was owned by J.W. and Lorene as joint tenants with right of survivorship. The record further shows that Charles attempted to collect on a third insurance policy (the Monumental policy), when Lorene was the named beneficiary.

Based upon this record, there is substantial evidence that Charles induced Lorene to sign the estate agreement by telling her she would take nothing under the will and by offering her property which by law was not part of the probate estate and which she already owned. In other words, Charles had facts within his knowledge as executor of the estate and either misrepresented those facts or failed to disclose the facts which would enable Lorene to make a free and understanding consent to the estate agreement. As such, there is support in the record under either the theory of constructive fraud or of false representation to sustain the district court's findings.

## REMOVAL OF EXECUTOR

Charles next argues the district court erred in removing him as executor of J.W.'s estate. He argues the court erred in finding he owed Lorene a fiduciary duty.

K.S.A. 59-102 reads in relevant part:

"(2) 'Personal representative' includes executors, administrators, administrators with the will annexed, and administrators *de bonis non*, conservators and guardians.

"(3) 'Fiduciary' includes personal representatives, trustees and surviving partners administering their trusts."

From the plain language of the statute, an executor is a fiduciary. The question is, to whom does he or she owe a duty?

"The position of executor . . . is a trust; it is fiduciary in character and its holder is a trustee for all persons interested in the estate . . . ." 31 Am. Jur. 2d, Executors and Administrators § 372, p. 193. As the fiduciary of all interested parties, he or she has a duty to see that their rights are correctly adjudicated. "He [or she] is also, in a sense, the representative of the deceased, and it is part of his [or her] duty to see that any will is properly executed." 31 Am. Jur. 2d, Executors and Administrators § 371, p. 193.

K.S.A. 59-1711 states that a fiduciary may be removed if he or she fails or refuses to perform any of the duties imposed upon him or her by law. Certainly, we are convinced that fraudulently trying to induce one of the beneficiaries of the estate to give up her legal rights to the assets of the estate would qualify as failing to fulfill

Charles' duty to see that Lorene's rights are correctly adjudicated. Therefore, the district court did not abuse its discretion by removing Charles because of his adversarial conduct toward Lorene. See generally *In re Estate of Anderson*, 168 Kan. 299, Syl. ¶¶ 4, 5, 212 P.2d 375 (1949) (An administrator or executor should not be appointed if such would place him or her in a position in which he or she is torn between his or her duty toward the estate and his or her personal interests. This is especially true when all other heirs are opposed to the appointment. His or her duty is to the estate.).

## SPOUSAL ALLOWANCE

Charles' final argument is that the court erred in awarding Lorene a spousal allowance. He first relies on the validity of the consent to the will as evidence that Lorene waived any such right. Based upon our above discussion on the consent, this argument is meritless.

K.S.A. 59-403 reads in relevant part:

"When a resident of the state dies, testate or intestate, the surviving spouse shall be allowed, for the benefit of such spouse . . . from the personal or real property of which the decedent was possessed or to which the decedent was entitled at the time of death, the following:

. . . .

"(b) A reasonable allowance of not more than $25,000 in money or other personal or real property . . . with the exact amount of such allowance to be determined and ordered by the court, after taking into account the condition of the estate of the decedent."

K.S.A. 59-404 reads:

"The surviving spouse, by electing to take under the will of the decedent or by consenting thereto, does not waive the homestead right nor the right to such allowance, unless it clearly appears from the will that the provision therein made for such spouse was intended to be in lieu of such rights."

The will in this case makes no mention of the spousal allowance, nor does the consent state that Lorene agreed to give up her statutory right. Therefore, the court did not err in awarding the spousal allowance. See *In re Estate of Laue*, 225 Kan. 177, 187, 589 P.2d 558 (1979).

Affirmed.